IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| **OBIE L. LOVELACE**, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action Number: |
| | ) | |
| v. | ) | |
| | ) | |
| **HAROLD CLARKE**, | ) | |
| in his individual capacity, | ) | |
| **DR. MARK AMONETTE**, | ) | |
| in his individual capacity, | ) | |
| **DR. CHARLES CAMPBELL**, | ) | |
| in his individual capacity, | ) | |
| **DR. STEVE HERRICK**, | ) | |
| in his individual capacity, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff, Obie Lovelace, through undersigned counsel and hereby submits this Complaint, pursuant to 42 U.S.C. § 1983 against the Defendants, to vindicate his rights guaranteed under the Eighth Amendment to the United States Constitution. In addition, Plaintiff seeks an award of damages for the harm caused to him by the violation of his constitutional right to lifesaving medical treatment.

## INTRODUCTION

### 1.

Defendants have instituted a state sanctioned policy and practice of the unconstitutional deprivation of medical care to inmates with chronic Hepatitis C.

### 2.

For five years, Mr. Lovelace pleaded with Virginia Department of Corrections ("VDOC") medical staff to administer lifesaving treatment for his chronic Hepatitis C infection. However, in 2017 as Mr. Lovelace's release date loomed closer, Defendants' response grew increasingly inhumane by the month.

### 3.

Defendants hoped Mr. Lovelace would go away: Though chronic Hepatitis C is curable, Defendants allowed Mr. Lovelace's condition to worsen until he developed cirrhosis of the liver - a condition which is not curable in half of the people who receive Hepatitis C treatment. This is because Defendants refused to treat Mr. Lovelace's chronic Hepatitis C.

### 4.

Mr. Lovelace did *not* receive any treatment for his chronic Hepatitis C or cirrhosis of the liver caused by untreated chronic Hepatitis C. Nor did Defendants ever approve Mr. Lovelace for Hepatitis C treatment. With all his worldly possessions in tow, Mr. Lovelace, a senior citizen, homeless, with

untreated cirrhosis of the liver, was released from St. Brides Correctional Center ("St. Brides"), never once having received the medical treatment to which he was entitled, or any medical treatment that addressed his chronic Hepatitis C.

5.

Mr. Lovelace has not gone away: He now brings this action to vindicate his rights under the Constitution and laws of the United States.

## JURISDICTION AND VENUE

6.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(a)(4), under 42 U.S.C. § 1983. Venue is proper under 28 U.S.C. § 1391(b) and L.R. 3 (b)(2) because (1) a substantial part of the events and omissions giving rise to Mr. Lovelace's claims occurred within this District and Division and (2) Defendants transact business in this District and Division.

## PARTIES

### A.    Obie Lovelace, Plaintiff

7.

Plaintiff Obie Lovelace is an elderly man who was diagnosed with chronic Hepatitis C and cirrhosis of the liver while in the custody of VDOC. He was also diagnosed with HIV, another, severe, life threatening disease, while in the custody of VDOC. He was housed at St. Brides Correctional Center, operated by

the VDOC in Chesapeake, Virginia from 2012 to 2017. During such time, he was consistently denied access to adequate medical care to treat his chronic Hepatitis C by Defendants and, as a result, developed cirrhosis of the liver. Mr. Lovelace consistently requested treatment for his chronic Hepatitis C, however, those requests were rejected verbally and in writing.

### B.    Harold Clarke, Defendant

8.

At all relevant times, Defendant Harold Clarke was the Director of the VDOC and was responsible for all oversight, operation, and administration of the Commonwealth's correctional system, including providing access to adequate medical treatment and the formulation of policies that ensure the provision of that access to adequate medical treatment to Plaintiff and those similarly situated. During all relevant times, Clarke had a duty to know that inmates such as Plaintiff under Clarke's care, custody, and control had chronic Hepatitis C and needed treatment for Hepatitis C (Hepatitis C was and remains a common and known problem within Virginia prisons, during all relevant times).

At all relevant times, Clarke knew about VDOC's Hepatitis C policy and that, in effect, said Hepatitis C policy refused treatment to many inmates who had chronic Hepatitis C. During all relevant times Clarke had the authority to

order modifications to the Hepatitis C policy in a manner that would have at the very least authorized approval for Mr. Lovelace's Hepatitis C treatment.

9.

At all relevant times, Clarke knew chronic Hepatitis C was a deadly disease and knew that ultimately Dr. Amonette made the determination of whether inmates chronically suffering from the deadly Hepatitis C virus needed treatment. In 2015, Clarke deliberately instituted, condoned, and ratified a VDOC policy in which VDOC inmates, known to be infected with chronic Hepatitis C, were not treated for said Hepatitis C infection. In sum, at all relevant times, Clarke approved and ratified the policies that were administered by Dr. Amonette and that were used to deny treatment to Mr. Lovelace by Defendants.

Clarke is being sued in his individual capacity. At all relevant times, Defendant Clarke acted under color of state law. At all times relevant, Clarke was responsible for knowing all applicable laws regarding the medical treatment of inmates under the VDOC's care, custody, and control.

**C.     Dr. Mark Amonette, Defendant**

10.

At all relevant times, Defendant Dr. Mark Amonette, M.D. was the Chief Physician and Medical Director of the VDOC and was responsible for overseeing the delivery of medical services to VDOC inmates. During all relevant times, as

director of medical services for VDOC, Dr. Amonette had a duty to know that inmates such as Plaintiff had chronic Hepatitis C and thus needed treatment for Hepatitis C. At all relevant times, Dr. Amonette's duty extended to collecting data about inmates who have Hepatitis C. During all relevant times, Dr. Amonette's duties also included ensuring treatment for all inmates who were known to have chronic Hepatitis C, while under the care and custody of the VDOC—irrespective of what stage said chronic Hepatitis C had reached. (Hepatitis C was and remains a common and known problem within Virginia prisons, at all relevant times.) Indeed, as VDOC's Chief Physician/Medical Director, and a high-ranking official under the supervision of Defendant Clarke, Dr. Amonette has reported on many occasions to Clarke that VDOC inmates known to be infected by chronic Hepatitis C are not receiving treatment for their Hepatitis C infections. Defendant Dr. Amonette has deliberately failed to treat or approve for treatment inmates known to carry the chronic Hepatitis C infection. Specifically, Dr. Amonette is liable under supervisory liability because, upon information and belief, he was told by Dr. Charles Campbell on or around February 23, 2017 the results of Mr. Lovelace's FibroScan, yet refused to approve or provide treatment for Mr. Lovelace's Hepatitis C. In sum, at all relevant times, Dr. Amonette administered and directed the implementation of policies used by Dr. Campbell, Dr. Steve Herrick, and Nurse C. Allen to deny Mr. Lovelace

treatment. Dr. Amonette had the authority to negate any subordinate's decision to approve Mr. Lovelace's Hepatitis C treatment. Dr. Amonette also had the authority to override his controlling guidelines, to approve and treat Mr. Lovelace's Hepatitis C.

Defendant Dr. Amonette is sued in his individual capacity. At all times relevant, Dr. Amonette was responsible for knowing all applicable laws regarding the medical treatment of inmates under the VDOC's care, custody, and control. At all times relevant, he acted under color of state law.

### D.    Dr. Charles Campbell, Defendant

11.

At all times relevant times, Dr. Charles Campbell, M.D. was an employee of Armor Correctional Health Services Inc., a Florida Corporation providing medical services to VDOC inmates. Beginning in 2015-2016, Dr. Campbell was Mr. Lovelace's treating physician at VDOC. Upon information and belief, at all relevant times, Dr. Campbell reported to Dr. Amonette. Dr. Campbell had been treating Mr. Lovelace since around 2015-2016.

On or around February 23, 2017, Dr. Campbell reviewed Mr. Lovelace's FibroScan, which indicated cirrhosis, yet never ordered, approved, or administered treatment to Mr. Lovelace for Hepatitis C. Upon information and belief, Dr. Campbell either reported Mr. Lovelace's results to Dr. Amonette or

did not report said FibroScan results to Dr. Amonette, per custom and policy of

informing Dr. Amonette of inmates who developed cirrhosis of the liver while

still carrying the Hepatitis C virus. Dr. Campbell is sued in his individual

capacity. At all times relevant, Dr. Campbell was responsible for administering

medical care to Mr. Lovelace.

### E.    Dr. Steve Herrick, Defendant

12.

Upon information and belief, Dr. Steve Herrick, Ph.D. is the signatory on

the October 10, 2017 appeal document, as the Director of Health Services for the

VDOC, is under the supervision of Defendant Clarke administratively,

supervises Dr. Amonette, and found Mr. Lovelace's appeal regarding the denial

of treatment of his Hepatitis C as "unfounded." In dismissing the appeal, Dr.

Herrick cited insufficient time to complete treatment of Mr. Lovelace's Hepatitis

C due to his "upcoming release in November 2017." Upon information and belief

Dr. Herrick knew as early as February 2017 that Mr. Lovelace needed Hepatitis C

treatment due to cirrhosis of the liver, yet never approved Hepatitis C treatment

to Mr. Lovelace. Dr. Herrick upon information and belief, knows that Dr.

Amonette supervises all institutional physicians, including those that work for

private companies. Dr. Herrick is sued in his individual capacity.

## RELEVANT FACTS

**A.    Obie Lovelace Enters VDOC With Diagnosed Chronic Hepatitis C**

13.

Obie Lovelace entered the Virginia Department of Corrections in 2010.

14.

At the time Mr. Lovelace entered the VDOC, he had multiple diagnosed health conditions, to include two deadly conditions, one being Hepatitis C, and the other being HIV.

15.

From 2010, the year of Mr. Lovelace's entry into VDOC custody, the *entirety* of Mr. Lovelace's VDOC medical records *repeatedly and unequivocally* indicate that he entered VDOC custody with Hepatitis C, originally diagnosed in or around 2004.

16.

Throughout Mr. Lovelace's prison term, beginning in 2010 and ending in 2017, he repeatedly requested that VDOC approve treatment for his Hepatitis C.

**B.    By 2015 - 2016 Defendant Dr. Campbell Knows Mr. Lovelace Has Chronic Hepatitis C**

17.

Upon information and belief, in 2015 or 2016, Dr. Campbell began treating Mr. Lovelace at VDOC and *knew* that he had been diagnosed with Hepatitis C

because Mr. Lovelace repeatedly told Dr. Campbell that he had Hepatitis C during that time (all the way through the date of his release) and Dr. Campbell reviewed Mr. Lovelace's medical records, which demonstrated that Mr. Lovelace had been infected with Hepatitis C since approximately 2004.

18.

In December 2016, Dr. Campbell ordered general lab tests for Mr. Lovelace and those lab tests demonstrated that Mr. Lovelace was still infected with Hepatitis C.

19.

Throughout his time under the care of Dr. Campbell, Mr. Lovelace made verbal requests to Dr. Campbell to receive treatment for his Hepatitis C.

C.    **From 2016 Forward the Prevailing Standard of Care Requires Approval for Treatment and Actual Treatment of All Persons Infected with Hepatitis C**

20.

The standard of care in the community for Hepatitis C infections—the use of Direct Acting Antiviral Drugs ("DAAs")—is now well-established. From 2016 to present the standard of care in treatment of chronic Hepatitis C is the use of DAAs and to treat or approve for treatment *everyone regardless* of the severity of fibrosis or cirrhosis.

21.

The standard of universal treatment was based on the emergence of medical data. Guidelines published by the American Association for the Study of Liver Disease (AASLD) were changed in 2016, as data emerged regarding the overall liver and non-liver benefits of Hepatitis C therapy, the excellent tolerability of treatment, and the extraordinarily high rates of Hepatitis C cure and treatment was recommended for everyone with Hepatitis C *regardless* of severity of their liver disease.

22.

Patients who are cured of their Hepatitis C infection experience multiple benefits including a decrease in liver inflammation, improvement in fibrosis, and resolution of cirrhosis in up to fifty percent (50%) of patients; diminished rates of portal hypertension, splenomegaly, and other clinical manifestations of advanced liver disease; a seventy percent (70%) reduction in the risk of liver cancer; and a ninety percent (90%) reduction in the risk of liver-related mortality and requirement for liver transplantation. In addition, cure of Hepatitis C infection also reduces symptoms and mortality from multiple non-liver associated manifestations of viral infection, including joint pain, rates of lymphoma, fatigue, diabetes, cryoglobulinemic vasculitis, and other non-liver cancers.

23.

Three premises are accepted in the current medical standard for treatment of Hepatitis C – a standard that has been in effect since 2016: (1) Having Hepatitis C for *greater than six months* constitutes a chronic illness; (2) The current standard of care is to treat *everyone* with rare exception; and (3) Cost *cannot* be a factor for altering the current standard for medical treatment. Inmates with known, chronic Hepatitis C should be immediately approved for treatment of their Hepatitis C.

24.

From June 2016 to April 2018, VDOC Treatment Guidelines listed inclusion criteria for treatment of Hepatitis C. One such factor for treatment inclusion is that the inmate have "at least 9 months remaining on their sentence at the time of treatment initiation." VDOC cited no medical reason to justify this policy, in light of a cure that takes literally 90 days or less to cure Hepatitis C, 120 days at max.

25.

Relevantly, Mr. Lovelace's diagnosis of Hepatitis C was entered in his medical record when he arrived at St. Brides in 2012, having first been diagnosed at or around 2004.

26.

Upon information and belief, Dr. Amonette knew, from as early as 2010 to the time of Mr. Lovelace's release in December 2017, that Mr. Lovelace had been infected with Hepatitis C for more than six months. At the absolute latest, Mr. Lovelace should have received or been approved for treatment between February 2017 (about nine months from his release date) to July 2017 (about ninety-days from his date of release). This also did not happen, and Defendants Dr. Campbell, Dr. Amonette and Dr. Herrick knew it did not happen.

**D.     In 2017 Defendants Find Out Mr. Lovelace Has Cirrhosis of the Liver as a Result of Untreated Hepatitis C**

27.

Around February 23, 2017 Mr. Lovelace's FibroScan scores showed that he had cirrhosis of the liver—mindful **again** that, (1) on or around February 6, 2017, about *nine months* prior to his release and well before the ninety (90) day threshold, Mr. Lovelace submitted a request to be treated using the drug Harvoni (the most commonly used DAA at that time) to treat his Hepatitis C and that (2) in response, on or around February 10, 2017, the Defendants' agent Health Services Administrator Ms. C. Allen, under supervision of the Defendants Clarke, Dr. Amonette, and Dr. Campbell, on information and belief, informed Mr. Lovelace that the doctor has a "strict criteria" for Hepatitis C treatment and that treatment will be administered based on his labs.

28.

On or around January of 2017, about ten months prior to Mr. Lovelace's release, Dr. Campbell ordered a FibroScan test for Mr. Lovelace.

29.

On or around February 23, 2017, Dr. Campbell *knew* that Mr. Lovelace had been seriously injured due to untreated Hepatitis C because said FibroScan demonstrated that Mr. Lovelace had an F-4 cirrhosis of the liver from untreated Hepatitis C, and because Dr. Campbell read said results in February 2017.

30.

The February 23, 2017 report also indicated that Mr. Lovelace was *not* currently taking any medications at the time for Hepatitis C.

31.

Upon information and belief, within two weeks of finding out Mr. Lovelace had cirrhosis of the liver, Dr. Campbell told Dr. Amonette that Mr. Lovelace had cirrhosis of the liver due to untreated Hepatitis C because Dr. Amonette supervised Dr. Campbell regarding whether to treat inmates, such as Mr. Lovelace, who showed injuries due to untreated Hepatitis C, injuries such as cirrhosis of the liver.

32.

Although Mr. Lovelace requested medical assistance for Hepatitis C by December of 2016, Mr. Lovelace did not receive and was not approved to receive treatment for Hepatitis C—despite all Defendants understanding through the review of literature and scientific advancement that there existed a cure for Hepatitis C that required 90 days or less of treatment.

33.

Even after knowing that Mr. Lovelace tested positive for cirrhosis of the liver, and knowing that Mr. Lovelace had another potentially fatal disease as well (HIV), Defendants still refused to (1) even approve Mr. Lovelace for Hepatitis C treatment and as a result (2) treat Mr. Lovelace's Hepatitis C.

1. **Mr. Lovelace's Grievances and Appeals For Treatment of His Hepatitis C**

34.

On or around August 18, 2017, Mr. Lovelace submitted an informal complaint (the first step in VDOC's grievance procedure) because he was informed by the VDOC Office of Health Services that he did not qualify to receive Hepatitis C treatment.

35.

On or around August 29, 2017, noting again that the doctor has "strict criteria" for treatment, upon information and belief, the Defendants' agent

Health Services Administrator Ms. C. Allen, with instructions from Dr. Campbell, informed Mr. Lovelace that because his FibroScan was completed in February that he would not have enough time to *complete* treatment by his release date of November 2017. No medical justification was cited by the Health Services Administrator, and when this statement was made to Mr. Lovelace, Defendants Dr. Campbell, Dr. Amonette and Dr. Herrick knew that, under the prevailing standard, Mr. Lovelace could undergo a Hepatitis C treatment—available to and used by Defendants—that had an extremely high success rate for curing Mr. Lovelace within 90 days.

36.

On or around September 6, 2017, Mr. Lovelace submitted a grievance because he was informed by Defendants that he did not qualify to receive Hepatitis C treatment; in the grievance, Mr. Lovelace again informed Defendants that he had been requesting the treatment for *five years.*

37.

On or around September 21, 2017, in response to said grievance, Warden B. Cabell, under the supervision of Defendant Clarke, found Mr. Lovelace's Grievance as "unfounded." No medical justification was cited by Warden B. Cabell to deny Mr. Lovelace medical treatment.

38.

On or around September 27, 2017, Mr. Lovelace submitted a final appeal of the Warden B. Cabell's decision, citing that Warden B. Cabell's decision affirmed the deprivation of medical care in violation of his civil rights under the U.S. Constitution.

39.

On or around October 10, 2017, in response, upon information and belief, Defendant Dr. Herrick, signed Mr. Lovelace's appeal response as the VDOC Health Services Director, and under the supervision of Defendants Clarke and Dr. Amonette, found Mr. Lovelace's appeal as "unfounded." In dismissing the appeal, Dr. Herrick's reasoning cited insufficient time to complete treatment of Mr. Lovelace's Hepatitis C due to his "upcoming release in November 2017," although upon information and belief Dr. Herrick knew that Mr. Lovelace could immediately begin treatment and continue treatment after his release from VDOC.

40.

A medical expert has determined that VDOC inmates with chronic Hepatitis C should have received treatment in 2016 at the very latest, irrespective of whether the patient received a FibroScan. *See* <u>Riggleman v. Clarke</u>, et al., 5:17-

cv-00063-NKM-JCH, W.D. Va., ECFs 92, 92-7, "Plaintiff's Second Brief in Support of His Motion for A Preliminary Injunction", "Plaintiff's Disclosure of Expert."

41.

On or about December 6, 2017, VDOC released Mr. Lovelace without ever administering treatment for Hepatitis C in an extreme deviation from the standard of care.

### E.   Liability of Dr. Amonette, Dr. Campbell and Dr. Herrick for Mr. Lovelace's Injury Caused by Untreated Hepatitis C While in the VDOC

42.

Dr. Amonette promulgated, ordered, and enforced a policy which prohibited Mr. Lovelace from being approved and treated for Hepatitis C, at all times relevant.

43.

Upon information and belief, Dr. Amonette either approved or denied all requests for Hepatitis C treatments made by inmates, to include Plaintiff, at all times relevant to this case. This approval or denial also occurred in response to Mr. Lovelace's multiple requests, over years, for Hepatitis C treatment.

44.

Accordingly, upon information and belief, as the physician responsible for approval of Hepatitis C treatment within the VDOC, Dr. Amonette had been

informed by Dr. Campbell of Mr. Lovelace's Hepatitis C—as early as January 1, 2016 – and therefore *knew* that Mr. Lovelace has Hepatitis C and developed cirrhosis of the liver from years of untreated Hepatitis C—yet Dr. Amonette directed Dr. Campbell to refuse treatment of Mr. Lovelace's Hepatitis C.

45.

In the alternative, upon information and belief, though Dr. Campbell *knew* Mr. Lovelace had been diagnosed with cirrhosis of the liver, Dr. Campbell failed to even advise Dr. Amonette of Mr. Lovelace's cirrhosis of the liver, and therefore, Dr. Amonette never made a decision pursuant to VDOC guidelines in order to, at the very least, approve Mr. Lovelace for Hepatitis C treatment.

46.

There is no medical justification for a treatment module for Hepatitis C infection that does not utilize or approve the direct-acting antiviral drugs such as simeprevir (Olysio) and sofosbuvir (Sovaldi) or sofosbuvir with ledipasvir (combined as Harvoni).

47.

Upon information and belief, because Dr. Herrick determined that Mr. Lovelace's grievance appeal was unfounded in October 2017, this guaranteed that even though Mr. Lovelace still had time to begin treatment, Mr. Lovelace would not be treated.

48.

Neither Dr. Amonette nor Dr. Campbell provided Dr. Herrick a medically justifiable reason not to treat Mr. Lovelace's Hepatitis C, which had already caused cirrhosis.

49.

Upon information and belief, had Dr. Herrick determined that Mr. Lovelace's grievance appeal was founded, i.e., it had merit and thus he should have already been approved for treatment, then Dr. Amonette would be forced to approve treatment because Dr. Herrick is Dr. Amonette's boss.

50.

Upon information and belief, Dr. Herrick has the authority to order Dr. Amonette to approve inmates for Hepatitis C treatment, and that is the reason Dr. Herrick, not Dr. Amonette, decides whether grievances requesting Hepatitis C treatment are founded or unfounded.

## F.     Clarke is Liable for Mr. Lovelace's Injury Caused by Untreated Hepatitis C While in the VDOC

51.

Upon information and belief, at all relevant times, Clarke *knew* VDOC inmates with chronic Hepatitis C were not receiving treatment Hepatitis C because of his ratification of the policy to refuse treatment to inmates with Hepatitis C.

52.

At all relevant times, Clarke's role was to ensure that qualified individuals

were in place to ensure the health and safety of VDOC inmates, and upon

information and belief, *to ratify by act or omission,* the protocols and policies

implemented by the Departments of the VDOC, including the Department of

Health Services.

53.

In fact, Clarke holds the authority to order changes to the VDOC Hepatitis

C policy, yet *refused* to do so.

54.

Indeed, Mr. Lovelace *never* received treatment for Hepatitis C or cirrhosis

of the liver prior to leaving the custody of VDOC.

**COUNT I**
**DEPRIVATION OF EIGHTH AMENDMENT RIGHT TO BE FREE FROM**
**CRUEL AND UNUSUAL PUNISHMENT BY RECEIVING ACCESS TO**
**ADEQUATE MEDICAL CARE PURSUANT TO 42 U.S.C § 1983**
(*Federal claim against Defendants Dr. Campbell, Dr. Amonette and Dr. Herrick*)

55.

Plaintiff fully incorporates paragraphs 1 through 54, *and any paragraph this*

*Court deems relevant*, as fully stated herein to support Plaintiff's Count I.

56.

Based on the incorporated paragraphs to support Count I, Defendants' acts and omissions in failing to provide adequate medical care—including any medical care whatsoever—constitute deliberate indifference to the serious medical needs of Mr. Lovelace, specifically his untreated chronic Hepatitis C, thereby establishing a violation of the Eighth Amendment of the United States Constitution. Consequently, Plaintiff is entitled to relief as set forth in the below titled section, "Prayer For Relief."

57.

Defendants' failure to provide the direct-acting antiviral treatment to Mr. Lovelace because of financial considerations, violate the U.S. Constitution, as they deny necessary and adequate medical care to Mr. Lovelace and other similarly situated VDOC inmates in violation of the Eighth Amendment to the United States Constitution. The fact is that for over a year, while Mr. Lovelace was under the care and custody of Defendants, they could have administered a Hepatitis C cure to him and could have gotten the results in less than three months. Defendants did not do this, even when Defendants knew Mr. Lovelace had cirrhosis of the live as a result of Defendants not treating Mr. Lovelace's chronic Hepatitis C. The rational and actual reason for not doing this was cost,

which is not a constitutionally permissible reason to deny adequate medical treatment.

## COUNT II
## SUPERVISORY LIABILITY
## PURSUANT TO 42 U.S.C § 1983
(*Federal claim against Defendants Clarke and Dr. Amonette*)

58.

Plaintiff fully incorporates paragraphs 1 through 54, *and any paragraph this Court deems relevant*, as fully stated herein to support Plaintiff's Count II.

59.

Based on the incorporated paragraphs to support Count II, Defendants are liable under the theory of supervisory liability because they ordered, condoned and ratified conduct that is the direct and proximate cause of Mr. Lovelace's chronic Hepatitis C going untreated during the entire time he was under the care and custody of Defendants – despite Defendants knowing of a cure for Hepatitis C for nearly two years while Mr. Lovelace was under their care and custody. Furthermore, upon information and belief, Dr. Amonette also personally participated in the actual decision not to treat Mr. Lovelace's chronic Hepatitis C and, therefore, he is liable under the theory of supervisory liability in multiple ways. Consequently, Plaintiff is entitled to relief as set forth in the below titled section, "Prayer For Relief."

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Mr. Lovelace, prays for a trial by jury and judgment against Defendants as follows:

(a)     That process, issue, and service be had on each Defendant;

(b)      That Plaintiff recover all costs of this litigation;

(c)     That Plaintiff receive compensatory damages;

(d)     Award Plaintiff's costs, including reasonable attorneys' fees under 42 U.S.C § 1988(b);

(e)     That Plaintiff receive Punitive Damages;

(f)     That Plaintiff receive Special Damages in an amount of at least $50,000 to include the cost of medical care to treat his Hepatitis C and complications from his Hepatitis C that went untreated for years, including cirrhosis; and

(g)     That Plaintiff receive such other and further relief as the Court deems just and proper.

Respectfully submitted this 15th day of February 2019,

/s/ MARIO B. WILLIAMS
Mario B. Williams (Va. # 91955)

**NEXUS DERECHOS HUMANOS ATTORNEYS, INC.**
44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
(404) 254-0442/ (703) 935-2453 FAX
mwilliams@ndhlawyers.com