# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**OBIE L. LOVELACE,**

   **Plaintiff,**

**v.**               **Civil Action No. 2:19-cv-75**

**HAROLD CLARKE,** *et al.,*

    **Defendants.**

## <u>MEMORANDUM OPINION AND ORDER</u>

This case alleging constitutional claims under 42 U.S.C. § 1983 is before the court on Defendant Dr. Charles Campbell's ("Campbell" or "Defendant") motion for summary judgment. (ECF No. 81). Plaintiff Obie Lovelace ("Lovelace" or "Plaintiff") opposes the motion. (ECF No. 96). Campbell was Lovelace's primary healthcare provider while Lovelace was incarcerated with the Virginia Department of Corrections ("VDOC"). Mem. Supp. Def.'s Mot. Summ. J. ("Def.'s Mem.") Ex. 1, Pl.'s Ans. Def.'s Interrog. ("Pl.'s Ans.") (ECF No. 82-1, at 4–5). In this action, Lovelace alleges that Campbell failed to treat his chronic Hepatitis C ("HCV") in violation of the Eighth Amendment. Compl. ¶¶ 55–57 (ECF No. 1, at 21–23). In support of his current motion, Campbell argues that the evidence is insufficient as a matter of law to permit a reasonable juror to conclude that he was deliberately indifferent to Lovelace's serious medical needs. Def.'s Mem. (ECF No. 82, at 8–23). Campbell also argues that Lovelace was not seriously injured because he received HCV treatment after his release and was eventually cured. <u>Id.</u> at 24–27. Finally, Campbell claims that he is entitled to qualified immunity. <u>Id.</u> at 27–30.

Both parties consented to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF No. 31). After reviewing the parties' briefs and the exhibits in the summary judgment record, I conclude that Campbell has failed to meet his burden to show that there is no genuine dispute as to whether he was deliberately indifferent to Lovelace's medical needs. I also find that Campbell has failed to show that there is no genuine dispute as to whether Lovelace suffered a serious injury as a result of Campbell's inaction. Lastly, I find that Campbell has failed to show that there is no genuine dispute that he is entitled to qualified immunity. Accordingly, for the reasons explained in detail below, the court DENIES Defendant's motion for summary judgment.

## I.   PROCEDURAL HISTORY

In February 2019, Lovelace filed suit pursuant to 42 U.S.C. § 1983 alleging that Campbell was deliberately indifferent to his serious medical needs—specifically his untreated chronic HCV—in violation of the Eighth Amendment.[1] Compl. ¶¶ 55–57 (ECF No. 1, at 21–23). He argues that Campbell knew he had HCV but failed to treat him because of its cost, causing him serious injury. Id. In March 2019, Campbell moved to dismiss Lovelace's complaint, arguing that, as to him, Lovelace had failed to state a claim. (ECF No. 7). Specifically, Campbell argued that, while Lovelace disagreed with the amount and type of treatment he had received, Campbell had in fact provided treatment to Lovelace during the relevant timeframe. Mem. Supp. Def.'s Mot.

---

[1] In addition to Campbell, Lovelace named the following as defendants in their individual capacities: Mark Amonette, M.D., Chief Physician and Medical Director of VDOC; and Steve Herrick, Ph.D., the Director of Health Services for VDOC. Compl. ¶¶ 10, 12 (ECF No. 1, at 5–8). Lovelace alleged that, like Campbell, Amonette and Herrick violated the Eighth Amendment pursuant to 42 U.S.C. § 1983. Compl. ¶¶ 55–57 (ECF No. 1, at 21–23). He also brought a claim for supervisory liability against Amonette under the same statute. Id. ¶¶ 58–59 (ECF No. 1, at 23). Both Amonette and Herrick have resolved the claims against them. Although Harold Clarke, Director of VDOC, was also originally named as a defendant in his individual capacity, he was dismissed from the case in November 2020. (ECF No. 51).

Dismiss (ECF No. 8, at 10–15).  Campbell also argued that Lovelace failed to plead a significant injury resulting from the alleged lack of care.  Id. at 15–16.  Chief Judge Mark S. Davis denied Campbell's motion to dismiss. (ECF No. 23, at 10–13).  The parties later consented to magistrate judge jurisdiction, (ECF No. 31), and the case was reassigned.

On July 15, 2022, Campbell moved for summary judgment.  (ECF No. 81).  Campbell argues that he was not deliberately indifferent to Lovelace's medical needs because he relied on records indicating Lovelace's HCV was being treated by an infectious disease specialist and because Lovelace's HCV was not a serious medical need.  Def.'s Mem. (ECF No. 82, at 15–23).  Campbell also argues that Lovelace has not suffered a serious injury because he was eventually treated for HCV and was cured.  Id. at 24–27.  Lastly, Campbell asserts that he is entitled to qualified immunity.  Id. at 27–30.  On August 5, 2022, Lovelace opposed Campbell's motion, arguing that Campbell did act with deliberate indifference because the specialist he purportedly relied on was not treating Lovelace's HCV, that his HCV was a serious medical need, and that Campbell's failure to treat it caused a significant injury.  Resp. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") (ECF No. 96, 15–19).  Lovelace also argues that Campbell is not entitled to qualified immunity.  Id. at 19–22.  On August 12, 2022, Campbell replied, Def.'s Reply, (ECF No. 97), and requested oral argument, (ECF No. 98).  On September 14, 2022, both parties appeared virtually via Zoom for oral argument.  Campbell's motion is ripe for decision.

## II.    **STATEMENT OF FACTS**

Lovelace was an inmate with VDOC from 2010 until approximately December 6, 2017.[2]  Pl.'s Ans. (ECF No. 82-1, at 4); Compl. ¶¶ 13, 41 (ECF No. 1, at 9, 18).  From 2012 until his

---

[2] Plaintiff has served various other sentences with VDOC, but they are not relevant to this motion.  See Lovelace Dep. 22:1–17, 29:1–9 (ECF No. 96-3, at 23, 30); see also Pl.'s Opp'n (ECF No. 96, at 1–2); Def.'s Reply (ECF No. 97, at 1 n.1).

release in 2017, Lovelace was housed at St. Bride's Correctional Center ("St. Bride's").  Pl.'s Ans. (ECF No. 82-1, at 4).  Campbell became the Medical Director at St. Bride's in July 2013, shortly after Lovelace arrived at the facility.  Id.; Def.'s Mem. SOF ¶¶ 2–3 (ECF No. 82, at 2).[3]  As Medical Director, Campbell was Lovelace's primary care physician throughout his incarceration. See Pl.'s Ans. (ECF No. 82-1, at 4–5).  Brief discussions of the available HCV treatment options at that time, as well as the VDOC guidelines under which Campbell was operating, are necessary to understand the analysis that follows.

A.     **Relevant Background on HCV Treatment.**

HCV is a virus that affects the liver.  Gordon v. Schilling, 937 F.3d 348, 351 (4th Cir. 2019).  "[F]or up to 85% of HCV-infected persons, the disease progresses into a chronic condition."  Gordon, 937 F.3d at 351.  Lovelace's medical expert, Paul J. Gaglio, M.D.,[4] will testify that HCV is considered chronic when it lasts longer than six months.  Pl.'s Opp'n Ex. D, Gaglio Report ("Gaglio Rpt.") ¶ 3(a) (ECF No. 96-4, at 2).  As the Fourth Circuit recently noted:

> Many of those afflicted with chronic HCV will experience liver damage, including scarring of the liver tissue, which is known as progressive fibrosis.  And about 20% of those with chronic HCV will develop cirrhosis of the liver, that is, long-term liver damage. Cirrhosis can lead to liver failure, and those with cirrhosis also face a significant risk of developing liver cancer.  Liver failure and liver cancer frequently develop in HCV-infected individuals up to twenty or thirty years after initial infection.

---

[3] Citations to Defendant's Statement of Facts ("SOF") are undisputed.  Compare Def.'s Mem. SOF (ECF No. 82, at 2–7), with Pl.'s Opp'n (ECF No. 96, at 1–5).  They are thus accepted as true for the purposes of this summary judgment motion.  EDVA Loc. R. 56(B); see also Fed. R. Civ. P. 56(e)(2).

[4] Campbell has not moved to exclude Dr. Gaglio's testimony.  Dr. Gaglio has almost 30 years of clinical experience, and he has served as the medical director for three liver transplant programs.  Gaglio Rpt. ¶ 9 (ECF No. 96-4, at 7).  He currently serves as a Professor of Medicine and the Director of Hepatology Outreach at Columbia University Medical Center.  Id. at 8.

4

_Gordon_, 937 F.3d at 351 (cleaned up).  According to Dr. Gaglio, patients who are coinfected with both HCV and human immunodeficiency virus ("HIV") are at "increased risk" of developing these complications, with liver decompensation "accelerat[ing] at a rate of 3.9 to 7.5% every year" in patients who have developed HCV-induced cirrhosis.  Gaglio Rpt. ¶¶ 4(b), 5 (ECF No. 96-4, at 4, 5).

Initial HCV therapies, which were often interferon-based, first became available around 1998.  _Id._ ¶ 5 (ECF No. 96-4, at 4).  These initial therapies, however, "produced inconsistent results and severe side effects."  _Cunningham v. Sessions_, No. 9:16-CV-1292-RMG, 2017 WL 2377838, at *1 (D.S.C. May 31, 2017); _see_ Gaglio Rpt. ¶¶ 4(b) (ECF No. 96-4, at 3).  In the 2010s, the Food and Drug Administration began approving direct-acting antiviral drugs ("DAAs"), "which have proven to be highly effective in the treatment and cure of Hepatitis C with minimal side effects."[5] _Cunningham_, 2017 WL 2377838, at *1; _see_ _Pfaller v. Clarke_, 630 B.R. 197, 200 (E.D. Va. 2021), _appeal docketed sub nom. Pfaller v. Amonette_, No. 21-1555 (4th Cir. May 10, 2021).[6]  By 2015, medical societies concerned with liver and infectious disease were recommending DAA therapy for HCV-HIV coinfected patients.  Gaglio Rpt. ¶ 5 (ECF No. 96-4, at 4).[7]  Today, DAAs produce "cure rates in greater than 95% of patients" coinfected with both HCV and HIV.  _Id._

---

[5] Background regarding DAAs is provided for context but is not material to the motion at hand.  It is also not reasonably disputed for the purposes of this motion.  _Cf._ Def.'s Reply (ECF No. 97, at 3) (arguing that Dr. Gaglio never represented when DAAs became readily available, but not disputing it for the purposes of the motion).

[6] _Pfaller_ is currently on appeal to the Fourth Circuit on the issue of whether Amonette is entitled to qualified immunity.  Br. Appellant Dr. Amonette, at 1 (ECF No. 25-1, at 7), _Pfaller v. Amonette_, No. 21-1555 (4th Cir. May 10, 2021).

[7] Dr. Gaglio's report specifically opines about Harvoni, a brand-name DAA.  _See, e.g.,_ Gaglio Rpt. ¶ 5 (ECF No. 96-4, at 4).  Harvoni is comprised of ledipasvir and sofosbuvir. _Id._ (ECF No. 96-4, at 5).  Lovelace was ultimately treated with Epclusa, another brand-name DAA comprised of sofosbuvir and velpatasvir.  _Id._ ¶ 6 (ECF No. 96-4, at 5).  The parties have not alleged any significant differences in the brand-name DAAs that are materially relevant to this motion.  Thus, all DAAs are treated collectively.

DAA treatment can be relatively costly.[8] Cf. Atkins v. Parker, 972 F.3d 734, 736 (6th Cir. 2020) (explaining that the cost of a single course of DAAs in 2015 was $80,000 to $189,000, although that cost had fallen to $13,000 to $32,000 per treatment course by 2019), cert. denied sub nom. Atkins v. Williams, 141 S. Ct. 2512 (2021).   However, for patients who receive DAA treatment and are cured of their HCV, there are "dramatic decreases in complications of HCV including hepatic decompensation, portal hypertension, liver cancer, liver-related mortality, and requirement for liver transplantation."   Gaglio Rpt. ¶ 5 (ECF No. 96-4, at 5).   Additionally, liver cirrhosis can "improve or resolve."   Id.

**B.     VDOC HCV Treatment Guidelines**

In October 2015, Mark Amonette, M.D., Chief Physician and Medical Director of VDOC, developed an Interim Guideline for Chronic Hepatitis C Infection Management ("VDOC Guidelines").[9] Pl.'s Opp'n Ex. E, VDOC Guidelines ("VDOC Guidelines") (ECF No. 96-5, at 35–

---

[8] In Lovelace's complaint, he alleges that he did not receive DAA treatment "because of financial considerations," such as its cost.   Compl. ¶ 57 (ECF No. 1, at 22).   Physicians are not prohibited from considering treatment cost if more affordable treatment is still effective.   See Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care, but medical personnel cannot simply resort to an easier course of treatment that they know is ineffective." (citing Ralston v. McGovern, 167 F.3d 1160, 1162 (7th Cir. 1999); Kelley v. McGinnis, 899 F.2d 612, 616 (7th Cir. 1990))); see also Reynolds v. Wager, 128 F.3d 166, 175 (3d Cir. 1997) ("[T]he deliberate indifference standard . . . does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society.").   However, this court does not need to consider the treatment cost to resolve this summary judgment motion.   Lovelace's cost allegations take issue with the VDOC guidelines (discussed below), which controlled when inmates became eligible for DAA treatment.   There are no allegations or proffered evidentiary support in connection with this motion that Campbell personally did not refer Lovelace for cost concerns.   It is thus beyond the scope of the current summary judgment motion.

[9] Several versions of interim guidelines were promulgated throughout 2015 as VDOC finalized its arrangement with the VCU Hepatology Clinic.   See VDOC Guidelines (ECF No. 96-5, at 1, 17, 35).   For example, Lovelace asserts that the February 2015 interim guidelines were distributed "to all medical clinics in the VDOC system."   Pl.'s Opp'n (ECF No. 96, at 5).   Campbell "does not dispute this fact," although he argues that it is not material.   Def.'s Reply (ECF No. 97, at 3).   Lovelace also references a June 2015 set of interim guidelines, see Pl.'s Opp'n (ECF No. 96, at 5–6), which are not in the record, see Def.'s Reply (ECF No. 97, at 4).   For the purposes of this motion, I generally refer to the guidelines in effect from October 2015, while recognizing that materially similar interim guidelines were available in February 2015.   The

45).  The VDOC Guidelines stated that all VDOC inmates who were eligible for HCV treatment would be referred for treatment at the Virginia Commonwealth University ("VCU") Hepatology Clinic.  Id. (ECF No. 96-5, at 35) (reciting that VDOC "has an [memorandum of understanding] with the VCU Medical Center Hepatology group to care for offenders with Hepatitis C and to provide medications for treatment").  Hepatology is a branch of medicine specializing in liver diseases.  Hepatology, Stedman's Medical Dictionary (27th ed. 2000).  No other medical treatment providers besides the VCU Hepatology Clinic were authorized to treat VDOC inmates for HCV.  See VDOC Guidelines (ECF No. 96-5, at 35–45); see also Pl.'s Opp'n Ex. B, Campbell Dep. ("Campbell Dep.") 20:25–21:2 (ECF No. 96-2) (stating that the physicians at the VCU Hepatology Clinic treated VDOC's HCV patients).

Under the VDOC Guidelines, the decision to refer an inmate for treatment at the VCU Hepatology Clinic was to be based on "HCV disease severity, presence of co-morbid conditions, and having sufficient time remaining in the [VDOC] to complete the evaluation, treatment, and follow-up."  VDOC Guidelines (ECF No. 96-5, at 35).  More specifically, inmates were eligible for referral based on their AST to Platelet Ratio Index ("APRI") and/or Fibrosis-4 scores ("Fib-4").[10]  Id. at 35–36.  An inmate with an APRI score greater than 1.5 and a Fib-4 score greater than 3.25 was eligible for immediate referral, while additional testing was required for an inmate with an APRI score between 0.5 and 1.5 and a Fib-4 score between 1.45 and 3.25.  Id. at 36 (describing

---

distinction between the various guidelines is not material to this motion, and I make no findings regarding them at this time.

[10] Both the APRI and Fib-4 tests are "non-invasive testing methods to measure scarring of the liver." Jackson v. Hall, No. 1:19-CV-332-LG-RPM, 2022 WL 1194692, at *2 (S.D. Miss. Jan. 27, 2022) (cleaned up), R. & R. adopted by 2022 WL 731530 (S.D. Miss. Mar. 10, 2022); see also Isbell v. Arnold, No. CV 17-0021-JB-MU, 2020 WL 1327402, at *7 (S.D. Ala. Mar. 5, 2020), R. & R. adopted by 2020 WL 1324065 (S.D. Ala. Mar. 20, 2020); Davis v. Turner, No. 4:18CV54-GHD-DAS, 2019 WL 2425678, at *1 (N.D. Miss. June 10, 2019).

"Inclusion Criteria for consideration of treatment").  Additionally, inmates were not eligible for treatment if they had less than nine months remaining on their sentence.  Id. at 38.  Inmates co-infected with HCV and HIV were eligible for referral "using the same criteria as offenders without co-infection."  Id. at 37; see also Campbell Dep. 63:10–14 (ECF No. 96-2).  The VDOC Guidelines required all HCV treatment referrals to be approved by Amonette before treatment could begin.[11] VDOC Guidelines (ECF No. 96-5, at 35, 40).

### C.    Lovelace's Medical Treatment While Incarcerated at St. Bride's.

Lovelace was diagnosed with HIV in 1992.  Pl.'s Ans. (ECF No. 82-1, at 5); Pl.'s Opp'n Ex. C, Lovelace Dep. ("Lovelace Dep.") 27:3–5 (ECF No. 96-3, at 28).  He was diagnosed with HCV in approximately 2004.  Lovelace Dep. 26:13–27:2 (ECF No. 96-3, at 27–28); see also Compl. ¶ 15 (ECF No. 1, at 9).  Before his incarceration with VDOC, Lovelace had participated in an HCV treatment trial during which he received interferon-based treatment, but he discontinued therapy after eight weeks because of severe side effects.  Gaglio Rpt. ¶ 4(b) (ECF No. 96-4, at 3); see also Lovelace Dep. 37:21–38:21 (ECF No. 96-3, at 38–39).  Thus, Lovelace was still coinfected with both HIV and HCV when he entered VDOC custody in 2010.  Compl. ¶ 15 (ECF No. 1, at 9).  In approximately 2012, his calculated Fib-4 scores indicated that he had also developed liver cirrhosis.  See Gaglio Rpt. ¶¶ 3(a), 4(a) (ECF No. 96-4, at 2–3); see also Def.'s Mem. (ECF No. 82, at 25 n.14) (quoting Gaglio Dep. 21:1–10 (ECF No. 90-1)).

---

[11] The parties dispute whether Campbell understood from the VDOC Guidelines that Bearman was prohibited from referring Lovelace directly to the VCU Hepatology Clinic.  See Pl.'s Opp'n (ECF No. 96, at 2); Def.'s Reply (ECF No. 97, at 3).  The VDOC Guidelines do not specifically state that non-VDOC physicians cannot make referrals.  See generally VDOC Guidelines (ECF No. 96-5).  However, the instructions do require requests for referral to be sent from a "facility" through Amonette with specific lab results and competed request forms.  Id. at 40.

8

1.    **Lovelace's Healthcare Providers**

Two physicians—Gonzalo M. Bearman, M.D., and Defendant Charles Campbell, M.D.—provided Lovelace with pertinent treatment during his incarceration. Understanding these doctors' relative role in the treatment of VDOC inmates with HCV is pivotal to this motion.

a.    **Gonzalo M. Bearman, M.D.**

In June 2010, Lovelace began care with Gonzalo M. Bearman, M.D, for his HIV.[12] Pl.'s Opp'n Ex. 3, VCU Records ("VCU Rec.") (ECF No. 82-3, at 230–35). Bearman is an infectious disease specialist, serves as chief of VCU Health's infectious disease division, and is a hospital epidemiologist. Pl.'s Opp'n Ex. A, Bearman Dep. ("Bearman Dep.") 7:13–16 (ECF No. 96-1). He is not a member of the VCU Hepatology Clinic. See id.; see also id. 29:1–4 (confirming that Bearman is "not a hepatologist"). Bearman testified that there are "a few infectious diseases" he does not treat, including HCV, which he refers to the VCU Hepatology Clinic. Id. 10:21–11:1. He has never treated HCV in his career. Id. 11:2–6 ("For my entire career I specifically have not treated hepatitis C."). Bearman described his treatment of VDOC prisoners as follows:

> [E]ssentially my role is that of a consultant. The only nuance . . . is that we, being the infectious disease specialists[,] will prescribe the HIV medications only through the Department of Corrections pharmacy, which is here at VCU Health. So essentially my focus is the HIV, [and I] comment on other things I think are appropriate[ly] relevant to the HIV global management. Everything else is deferred back to the Department of Corrections for treatment or referral as they see appropriate.

Id. 12:8–17. Bearman testified that he does not make any direct referrals, even to other VCU doctors. Id. 13:9–23. Instead, he recommends referrals to the VDOC physicians. Id. 13:17–14:3.

---

[12] Beginning in 2012, Bearman's assigned HIV treatment regime was compatible with HCV DAA treatment. Gaglio Rpt. ¶ 5 (ECF No. 96-4, at 5) (opining that there were no "significant drug-drug interaction[s]" between Lovelace's HIV regimen and Harvoni).

When treating patients coinfected with both HIV and HCV, Bearman testified that his job was to "deal with" the HIV. Id. 14:12–15. He would also mention the patient's HCV in his consultation notes, but ultimately "defer" the HCV coinfection back to VDOC with certain recommendations for screening. Id. 14:16–24. In other words, Bearman would not be the person "actually ordering the ultrasounds"[13] or "ordering the consult" with the VCU Hepatology Clinic but would merely recommend to VDOC that those steps be taken. Id. 14:25–15:2. Regarding these recommendations, Bearman explained that he would "simply state in the record what [he] would like ordered, and [the VDOC physicians would] carry it out." Id. 25:25–26:2; cf. id. 112:15–20 (acknowledging that Bearman's treatment recommendations were "essentially orders from [him] to a physician or staff at [VDOC] to perform these tests"). Bearman's recommendations would be communicated to VDOC physicians through his consultation notes and any test results. Id. 116:5–8; see also Campbell Dep. 40:3–6 (ECF No. 96–2) (stating he received Bearman's recommendations "[t]hrough a chart review").

### b.     Charles Campbell, M.D.

As Medical Director at St. Bride's, Campbell was the inmates' "on-site" primary care physician who would "assess and determine if they need[ed] any type of specialty care." Campbell Dep. 8:11–15 (ECF No. 96-2). With regard to HCV, Campbell would monitor inmates' lab tests and, following the return of any abnormal results, would order antibody testing to determine if the inmate in question was HCV-positive. Id. 17:4–12. He would also calculate the inmate's APRI and Fib-4 scores. Id. 17:4–18:2. Under the VDOC Guidelines, Campbell had the authority to decide "whether and when to calculate an APRI score," although other treating physicians were not precluded from also doing so. Id. 27:8–20. If it was determined that an inmate needed

---

[13] An ultrasound is a "preliminary screening test[] for cirrhosis." Bearman Dep. 73:3–5 (ECF No. 96-1).

specialty treatment, they would be "referred out" to receive that care.  Id. 8:13–15.  According to

Campbell, his role in treating inmates with HCV was to "get them in front of the VCU physicians"

who then "decided what the treatment would be, or whether they needed treatment at all."  Id.

51:10–15.  Campbell was aware that all inmates being treated for HCV saw hepatologists at the

VCU Hepatology Clinic.  Id. 20:25–21:11.  He was also familiar with the VDOC Guidelines and

consulted them regularly.  Id. 24:18–25:22.

> **2.      Plaintiff's HCV Treatment by Bearman and Campbell During His Incarceration with VDOC.**

As noted above, Lovelace began care with Bearman for his HIV in June 2010.  VCU Rec.

(ECF No. 82-3, at 230–35).  At Lovelace's initial appointment, Bearman made notes regarding

Lovelace's HCV, see id. at 234, as was his typical practice when treating an HIV patient with an

HCV coinfection, Bearman Dep. 14:16–17.  Specifically, Bearman noted that Lovelace had "failed

treatment" for HCV, that there were "no additional treatments at this time," and that he would

check Plaintiff's alpha-fetoprotein ("AFP") level.[14]  VCU Rec. (ECF No. 82-3, at 234).  After this

initial appointment, Lovelace met with Bearman at least biannually between 2010 and his release

from VDOC custody in 2017.  See Def.'s Mem. SOF ¶ 12 (ECF No. 82, at 4).  At each

appointment, Bearman made notes regarding Lovelace's HCV.  Id. ¶ 14.

When Campbell became Lovelace's primary care physician in 2013, Bearman had been

treating Lovelace's HIV in this manner for several years.  See Id. ¶¶ 13, 15.  To that point, all of

Bearman's HCV notes remained consistent with the notes he made at Lovelace's initial

appointment: he recorded Lovelace's AFP levels during several appointments, see, e.g., VCU Rec.

---

[14] AFP is a protein that is produced in connection with regeneration of liver cells. Def.'s Mem. (ECF No. 82, at 3 n.3).  An elevated AFP level denotes inflammation and is a marker for potential liver cancer or cirrhosis. Bearman Dep. 25:5–10, 72:22–73:2 (ECF No. 96-1).

(ECF No. 82-3, at 141, 206, 221), wrote that he would continue to monitor Lovelace's AFP level, see, e.g., id. at 132, 180, 206, and repeated that there were "no additional treatments at this time," see, e.g., id. at 141, 180, 221.  Bearman testified at his deposition that his notations for "no additional treatments at this time" did not mean that Lovelace should not receive any additional treatments, but rather that no treatments were available because he had failed interferon therapy and DAAs had yet to be developed.  Bearman Dep. 24:2–19, 36:23–37:1 (ECF No. 96-1).

According to Campbell, he understood that Bearman was primarily treating Lovelace for his HIV.  See Campbell Dep. 22:5–7 (ECF No. 96-2).  He also understood that Bearman was not a VCU hepatologist.  Id. 50:14–18 ("I was aware that Dr. Bearman was not a hepatologist.").  In spite of those facts, Campbell testified at his deposition that he believed Bearman was treating Lovelace's HCV.  Id. 22:8–11.  Campbell acknowledged that Bearman never explicitly told him that he was treating Lovelace's HCV, but explained that he nonetheless believed from his reading of Bearman's notes that Bearman was in fact providing HCV treatment.  Id. 49:10–17.  In Campbell's view, Bearman's provision of HCV treatment was appropriate because Bearman was "an infectious disease specialist" who would know "what medication was available" and how it would interact with Lovelace's HIV coinfection.  Id. 50:16–23; see also id. 22:23–24.  In other words, he believed Bearman's provision of HCV treatment was a "special circumstance" compared to the usual HCV treatment inmates received at the VCU Hepatology Clinic.  Id. 50:25; see also id. 23:24–24:3 (acknowledging he was unaware of any other inmates seeing Bearman for their HCV).  When asked if he was aware that Bearman "specifically" denied handling Lovelace's HCV, Campbell reiterated his belief that Bearman was appropriately providing HCV treatment:

> Bearman, despite not being the treating physician, still ordered all the labs, monitored all the labs.  He was the infectious disease specialist and I took his recommendations very seriously and paid attention to what he recommended as far as the hepatitis C was

12

> concerned. Because he is an infectious disease specialist and I'm a
> general practitioner . . . . [A]s far as I was concerned during the
> management of the patient, Dr. Bearman was the one who
> recommended what labs be ordered and when they'd be ordered.
> He's the one that was the specialist here. And I, you know, listened
> to what he said and took his guidance on the patient.

Id. 22:12–23:13.

Bearman's notes from Lovelace's appointments in 2014 and subsequent years are particularly relevant to this motion. In April 2014, Bearman mentioned in his HCV notes the need to "[f]ollow LFT," VCU Rec. (ECF No. 82-3, at 105), which stands for liver function test and is a screening test "to make sure there isn't increasing or worsening liver damage," Bearman Dep. 73:7–13 (ECF No. 96-1). Bearman repeated his note about the LFT at Lovelace's following appointment in August 2014, this time adding that he had reviewed the result of a screening ultrasound and found no evidence of liver cancer or cirrhosis. VCU Rec. (ECF No. 82-3, at 95). He also noted the need to repeat the screening ultrasound in July 2015. Id.

In January 2015, Bearman again noted the need for another screening ultrasound, writing "repeat screening ultrasound in July 2015- please order." Id. at 84. At Lovelace's next appointment in August 2015, Bearman noted that the ultrasound came back "normal" and added an instruction to "repeat AFP, hep C viral load and ultrasound in July/August 2016." Id. at 73. Bearman acknowledged during his deposition that this recommendation was "essentially" an order to Campbell, or another VDOC physician, to perform these tests for his analysis. Bearman Dep. 112:16–20 (ECF No. 96-1). Campbell interpreted this August 2015 note as a directive. Campbell Dep. 94:20–23 (ECF No. 96-2). In his notes for each of these 2014 and 2015 appointments, Bearman continued to record Lovelace's AFP level, note that Lovelace had failed HCV treatment, and repeat that there were "no additional treatments at this time." VCU Rec. (ECF No. 82-3, at 73, 84, 95, 105).

13

In December 2015, Campbell calculated Lovelace's APRI score as 0.833 and his Fib-4 score as 3.18, both of which were above the VDOC Guidelines cutoff to refer patients to the VCU Hepatology Clinic for additional testing. Campbell Dep. 39:12–21 (ECF No. 96-2) (testifying that Lovelace's scores "potentially referred him for more liver tests"); see VDOC Guidelines (ECF No. 96-5, at 36). At that point, Campbell had authority to refer Lovelace for a FibroScan.[15] Campbell Dep. 99:15–100:3 (ECF No. 96-2). However, Campbell did not refer Lovelace for testing because he was "following the recommendations of Dr. Bearman who said that he was not a candidate for treatment at that time." Id. 39:22–40:2; see also id. 40:7–15 (relying on Bearman's notations that there was "no further treatment at this time"). He also did not transmit Lovelace's APRI and Fib-4 scores to Bearman, testifying that he "had every reason to believe that Dr. Bearman had access to all the same labs [he] had, and had the ability and capability of calculating" Lovelace's scores independently. Id. 41:2–13. However, at no point did Bearman calculate Lovelace's Fib-4 scores because that was "beyond the scope of [his] practice," and he likewise was unaware of how to properly use APRI terminology in clinical practice. Bearman Dep. 28:15–29:4 (ECF No. 96-1). Campbell also did not inform Bearman that he was declining to refer Lovelace for further testing based on Bearman's recommendation. Campbell Dep. 42:23–43:9 (ECF No. 96-2).

In August 2016, Bearman deviated from his normal note indicating that Lovelace had failed HCV treatment, this time writing that Lovelace had specifically failed treatment with peg-interferon. VCU Rec. (ECF No. 82-3, at 48). He also omitted his usual notation that no further

---

[15] A FibroScan is a test that determines liver fibrosis. Pl.'s Opp'n SOF ¶ 4 (ECF No. 96, at 5). In particular, a FibroScan "looks for signs of decreased elasticity in the liver." Campbell Dep. 74:22–25 (ECF No. 96-2).

14

treatment was available[16] and wrote that he would "request referral to VCU hepatology-telemedicine." Id. At deposition, Bearman clarified that he intended to request referral from VDOC depending on the results of Lovelace's HCV viral load testing, because he believed DAAs had become available by that time. Bearman Dep. 90:23–93:16 (ECF No. 96-1). Four months later, in December 2016, Campbell preemptively referred Lovelace to VCU Hepatology Clinic for a FibroScan. Def.'s Mem. Ex. 5A–5O, VDOC Records ("VDOC Rec.") (ECF No. 88-3, at 22–23). He testified that he preemptively made the referral because he thought the FibroScan "was going to be something [Bearman] was going to need if he was referring [Lovelace] to [the VCU Hepatology Clinic]." Campbell Dep. 77:12–15 (ECF No. 96-2). Campbell explained that he waited four months to make the referral because the FibroScan was not urgent and Bearman "had not asked for it yet." Id. 77:17–20. At that time, Campbell also recalculated Lovelace's APRI and Fib-4 scores. Id. 63:21–64:6, 64:24–65:7.

The requested FibroScan was performed on February 23, 2017 and confirmed Lovelace's chronic HCV. VDOC Rec. (ECF No. 88-3, at 7–14). It also showed F4 cirrhosis, Bearman Dep. 103:13–21 (ECF No. 96-1), which is "enough inflammation to warrant treatment," id. 98:9–13. The FibroScan records indicated that Lovelace had a follow-up appointment scheduled with Bearman on March 16, 2017. VDOC Rec. (ECF No. 88-3, at 9); see also Herrington Dep. 52:18–53:8 (ECF No. 89-4).[17] At that subsequent March appointment, Bearman noted that the "Fibroscan scan [was] in process" and that Lovelace had "begun [the] process of treatment assessment with

---

[16] On all subsequent appointment records, Bearman continued to specify that Lovelace had failed peg-interferon treatment and omit his notation that no further treatments were available. VCU Rec. (ECF No. 82-3, at 15–16, 41).

[17] Ryan Herrington, M.D., is Lovelace's medical expert. He has previously been the medical director for a 2,000-bed male prison and currently is the medical director for a nonprofit opioid clinic. Herrington Dep. 5:11-6:8 (ECF No. 89-4). He opines on the "correctional aspect" of the standard of care. Id. 20:14–17.

[the] hepatology service." VCU Rec. (ECF No. 82-3, at 41). Although the FibroScan was complete at that point, Bearman made these notes because he had not yet received or reviewed the results and therefore believed the testing to still be in progress. Bearman Dep. 105:7–16 (ECF No. 96-1); see also Herrington Dep. 53:9–16 (ECF No. 89-4).

The FibroScan results were sent to Campbell, who received and reviewed them. Campbell Dep. 98:3–6 (ECF No. 96-2). He understood that the FibroScan indicated Lovelace had F4 cirrhosis. Id. 98:7–15. He also acknowledged at his deposition that Lovelace "would have benefitted from treatment" at that time. Id. 99:1–5. However, Campbell testified that the only actions he took in response to the FibroScan results were continued "monitor[ing] in clinic" and "await[ing] recommendations from VCU." Id. 100:6–7. Campbell never requested referral to VCU Hepatology for HCV treatment. Id. 100:8–10.

In September 2017, Lovelace again met with Bearman. VCU Rec. (ECF No. 82-3, at 3–17). At this point, Bearman recorded that the FibroScan was complete and that Lovelace was "awaiting follow-up by [the] VCU hepatology service." Id. at 15. Lovelace testified that he told Bearman that he "had cirrhosis of the liver" and "was supposed to be seeing somebody" at VCU— specifically a "female" provider who would "actually [give him] the medication" he needed—but that he never heard back from anyone. Lovelace Dep. 129:16–130:3 (ECF No. 96-3, at 130–131). Bearman made a note that he would "inquire about follow up with VCU hepatology service-today – 9/14/2017." VCU Rec. (ECF No. 82-3, at 16). At his deposition, Bearman admitted that the process of addressing Lovelace's HCV "seem[ed] to have stopped" after the FibroScan.[18]

---

[18] Although not relevant to this motion, Bearman appears to have followed up with the VCU Hepatology Clinic to "advocate" for Lovelace. See Bearman Dep. 97:7–102:2 (ECF No. 96-1); VCU Rec. (ECF No. 82-3, at 10–11). He testified that by the time he was speaking with the telemedicine coordinator, she was concerned that Lovelace would not have sufficient time remaining on his sentence to complete the

Bearman Dep. 122:8–12 (ECF No. 96-1).  Lovelace never received DAAs while incarcerated at St. Bride's.

### D.   Lovelace's Medical Treatment After Release from VDOC.

After Lovelace was released from VDOC, he received further medical treatment which confirmed that he had cirrhosis.  Gaglio Rpt. ¶ 6 (ECF No. 96-4, at 5).  He received a 12-week course of DAAs in 2019, which cured his HCV.  Id.; see also Lovelace Dep. 24:21–25:2 (ECF No. 96-3, at 25–26) (admitting that his HCV "has been cured" and that his HIV "is under control").  In January 2020, a follow-up MRI exam "revealed evidence of several liver nodules concerning for liver cancer."  Gaglio Rpt. ¶ 6 (ECF No. 96-4, at 5).  His AFP level had also increased.  Id.

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986).  "A material fact is one 'that might affect the outcome of the suit under the governing law.'  A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact.  Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322–24.  When

---

treatment.  Bearman Dep. 100:3–101:21 (ECF No. 96-1).  Lovelace testified that he was ultimately denied DAA treatment based on his release date.  See Lovelace Dep. 93:3–13 (ECF No. 96-3, at 94).

the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## IV.    ANALYSIS

Lovelace brings his claim under 42 U.S.C. § 1983, which requires a plaintiff to "show that the defendant, acting under color of state law, violated the plaintiff's constitutional rights and thereby caused the plaintiff injury." Coppage v. Mann, 906 F. Supp. 1025, 1035 (E.D. Va. 1995). Thus, to defeat Campbell's motion for summary judgment, Lovelace must establish "a genuinely disputed issue of a material fact as to each of four elements: (1) that the defendants were state actors; (2) that the challenged conduct caused him injury; (3) that his alleged harms were serious; and (4) that the defendants acted with deliberate indifference." Id. (cleaned up).

Campbell alleges that Lovelace cannot overcome the undisputed evidence in this case. First, Campbell argues that he did not act with deliberate indifference because (1) he deferred to Bearman's judgment as a treating specialist and (2) Lovelace's HCV was not serious, at least at the outset, because there were no available treatments. Def.'s Mem. (ECF No. 82, at 15-23). Second, Campbell argues that Lovelace was not seriously injured because he received DAA

18

treatment after his release, which cured his HCV.  Id. at 24-27.  Lastly, Campbell argues that he is entitled to qualified immunity because (1) Lovelace's constitutional rights were not violated and (2) the alleged right was not clearly established.  Id. at 27-30.  Lovelace resists Campbell's characterization of these facts.  Pl.'s Opp'n (ECF No. 96, at 15-22).

After a review of each of these arguments, it appears that the record contains sufficient evidence for reasonable jurors to conclude that Campbell acted with deliberate indifference to Lovelace's serious medical needs.  The summary judgment record would also allow a reasonable juror to conclude that Lovelace was seriously injured because of the delayed HCV treatment he received because of Campbell's inaction.  Finally, the evidence in the record does not appear to contain sufficient evidence to establish that Campbell is entitled to qualified immunity.  I therefore DENY Defendant's motion for summary judgment.  (ECF No.  81).

## A.    The Undisputed Evidence is Sufficient for Reasonable Jurors to Conclude Cambell Acted with Deliberate Indifference Under the Eighth Amendment.

Under the Eighth Amendment, an inmate has the right to be free from prison officials' deliberate indifference toward a serious medical need.  Estelle v. Gamble, 429 U.S. 97, 104 (1976) (holding that such indifference "constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment" (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976) (cleaned up)).  A claim for deliberate indifference related to medical treatment has two requisite elements: (1) the plaintiff must have a "sufficiently serious" medical condition; and (2) the prison official must have acted or failed to act with a "sufficiently culpable state of mind."  Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citations omitted).  The first element is viewed objectively, requiring evidence that the deprivation posed a substantial risk of serious harm.  Pfaller v. Clarke, 630 B.R. 197, 212 (E.D. Va. 2021).  The second prong is viewed subjectively, requiring proof that the state actor—in this case Campbell—knew of and disregarded an excessive risk to inmate health

and safety." Id. (quoting De'Lonta v. Angelone, 330 F.3d 630, 634 (2003)).   In this case, Campbell has failed to show that there is no genuine dispute of material fact with respect to each of these elements.

The question—as it relates to this motion—is not whether the VDOC Guidelines constitute a "conscience-shocking" approach to providing DAA treatment to HCV-infected inmates generally. Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1272 (11th Cir. 2020). Other courts have examined this question directly. See generally id.; Atkins v. Parker, 972 F.3d 734 (6th Cir. 2020), cert. denied sub nom. Atkins v. Williams, 141 S. Ct. 2512 (2021). It is well established that, while prison officials may prioritize treatment, they cannot enact a policy that "effectively says 'only the sickest get treatment, and the rest must get sicker before we treat them.'" Reid v. Clarke, No. 7:16-CV-00547, 2018 WL 3626122, at *4 (W.D. Va. July 30, 2018); see also Pfaller, 630 B.R. at 212 (denying summary judgment when "a reasonable jury could conclude that the VDOC Guidelines excluded certain inmates until they got sicker"). Rather, the question here is whether Campbell individually, as Lovelace's primary care physician, acted with deliberate indifference by failing to refer Lovelace to the VCU Hepatology Clinic, or otherwise treat Lovelace's HCV.   As discussed below, the record contains sufficient evidence for a reasonable juror to conclude that Campbell did act with deliberate indifference.

**1.    There is a dispute of material fact regarding whether Lovelace's HCV and resulting liver cirrhosis was an objectively serious medical need.**

The objective prong of the plaintiff's prima facie case in a § 1983 action requires he show that he suffered "a serious deprivation of a basic human need" at the hands of the prison officials in question. Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993). A medical need is sufficiently serious when it "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."

20

Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (quoting Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)).  The condition must pose a risk to the prisoner such that "it would result in further significant injury or unnecessary and wanton infliction of pain if not treated."  Formica v. Aylor, 739 F. App'x 745, 755 (4th Cir. 2018) (citation omitted).  Here, there is little dispute that Lovelace's HCV was an objectively serious medical need, at least by 2015 when his APRI and Fib-4 scores met the VDOC standards for referral to the VCU Hepatology Clinic.

HCV is generally a serious medical condition.  See Pl.'s Opp'n (ECF No. 96, at 17–18). At the motion to dismiss stage, this court previously rejected Campbell's argument that Lovelace's untreated HCV was not serious.  See Order (ECF No. 23, at 13) (noting that Lovelace had plausibly alleged that "his potentially irreversible and untreated cirrhosis worsened" while in custody).  At summary judgment, Lovelace also proffered sufficient evidence that his HCV infection was causing him measurable harm.  The evidence in the record shows that he was diagnosed with HCV before entering Campbell's care.  Lovelace Dep. 27:13–22 (ECF No. 96-3, at 28); see also Compl. ¶ 15 (ECF No. 1, at 9).  In December 2015, Campbell calculated Lovelace's APRI score as 0.833 and his Fib-4 score as 3.18, both of which were above the VDOC Guidelines cutoff to refer Lovelace for further testing.  Campbell Dep. 39:12–21 (ECF No. 96-2); cf. VDOC Guidelines (ECF No. 96-5, at 35).  Campbell was also aware that Lovelace was not receiving DAA treatment. See Campbell Dep. 100:4–7, 102:1–19 (ECF No. 96-2); but see id. 102:1–4 (acknowledging that clinic never told him that Lovelace qualified for DAAs). Dr. Gaglio, Lovelace's medical expert, testified that untreated HCV—particularly with a HIV coinfection—places patients at an increased risk for serious health issues such as cancer, fibrosis, cirrhosis, and decompensated liver disease. Gaglio Rpt. ¶ 4 (ECF No. 96-4, at 4).  And in February 2017, Lovelace's FibroScan—which was delivered to Campbell—showed that he had developed F4 cirrhosis.  Bearman Dep. 98:9–13,

103:13–21 (ECF No. 96-1); Campbell Dep. 98:3–99:5 (ECF No. 96-2); see also Compl. ¶ 29 (ECF No. 1, at 14) (alleging that Campbell "knew" Lovelace was injured from the date of the FibroScan). This evidence raises a genuine issue of material fact regarding the severity of Lovelace's condition.

Campbell argues that Lovelace's HCV was not sufficiently serious because—when Campbell assumed his care in November 2013—there were no additional effective treatments available on the market. Def.'s Mem. (ECF No. 82, at 20–21). As the Fourth Circuit observed in Jackson v. Lightsey, 775 F.3d 170 (4ᵗʰ Cir. 2014), a serious medical condition is one that mandates treatment. Jackson, 775 F.3d at 178. Campbell argues that "[f]ar from a medical condition that had been diagnosed by a physician as mandating treatment, Mr. Lovelace's [HCV] was a medical condition for which a specialist had specifically documented there was no treatment to pursue." Def.'s Mem. (ECF No. 82, at 20–21). However, the fact that there were no treatments available to pursue in 2013 has no bearing on whether Lovelace's HCV was serious enough to mandate treatment throughout his incarceration. That is because the severity of a medical condition is not contingent on whether some form of treatment is available, but rather on whether the patient would need to receive treatment if it was available. In addition, Campbell's contention that Bearman opined there were no treatments to pursue is contradicted by Bearman's testimony and testing Campbell directed and analyzed himself. While Bearman initially wrote in his notes that there were no additional treatments available, he testified that those notes were not intended to be a recommendation that Lovelace should not receive additional treatment, but rather a comment on the availability of new HCV medicines at that time. Bearman Dep. 24:2–19 (ECF No. 96-1). In other words, the evidence on which Campbell relies in making his argument only shows that there were no additional HCV treatments available, not that Lovelace's HCV was insufficiently serious to warrant additional treatment.

22

Campbell also argues that Lovelace's HCV was not serious because his condition was not at risk of significantly worsening. Def.'s Mem. (ECF No. 82, at 23). A serious medical condition must pose a "substantial risk of serious harm" if left untreated. Rush v. VanDevander, No. 7:08CV0053, 2008 WL 495651, at *1 (W.D. Va. Feb. 21, 2008) (citation omitted). Campbell states that Lovelace's HCV "had been a chronic condition for nearly a decade and had not resulted in such injury." Def.'s Mem. (ECF No. 82, at 23). However, the fact that Lovelace's HCV had not yet caused further injuries when he first came under Campbell's care in 2013 does not prove that Lovelace's HCV was not serious. As noted above, prison officials cannot choose to only treat the sickest inmates and allow the rest to get sicker before providing treatment. See Clarke, 2018 WL 3626122, at *4; see also Pfaller, 630 B.R. at 212 (denying summary judgment when "a reasonable jury could conclude that the VDOC Guidelines excluded certain inmates until they got sicker"). Here, Lovelace has substantial evidence from his expert Dr. Gaglio and from his later testing that untreated HCV places patients at an increased risk for liver issues such as cancer, fibrosis, cirrhosis, and decompensated liver disease. Gaglio Rpt. ¶ 4 (ECF No. 96-4, at 4). In fact, Lovelace did develop one of these complications—F4 cirrhosis—which was shown in the 2017 FibroScan that Campbell reviewed. In other words, although Campbell argues that Lovelace's HCV was not at risk of significantly worsening, reasonable jurors could rely on Lovelace's evidence showing that (1) his HCV was at risk of worsening and (1) it actually worsened under Campbell's care. This evidence is sufficient to raise a genuine dispute regarding the severity of Lovelace's condition.

### 2.   There is a dispute of material fact regarding whether Campbell subjectively acted with deliberate indifference to Lovelace's medical needs.

Because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," it is not sufficient to demonstrate that the medical condition is serious. Farmer, 511

23

U.S. at 834 (quoting Wilson, 501 U.S. at 297).  The plaintiff must also show that the prison official acted with a culpable state of mind—that is, with "deliberate indifference to inmate health or safety."  Id. (quoting Wilson, 501 U.S. at 302–03) (cleaned up).  Thus, the official must have known (1) about the inmate's serious medical condition; and (2) the excessive risk posed by the action or inaction.  Scinto v. Stansberry, 841 F.3d 219, 226 (4th Cir. 2016) (quoting Jackson, 775 F. 3d at 178); see also Iko, 535 F.3d at 241 (requiring both "actual knowledge" of the risk and understanding "that his actions were insufficient to mitigate" it).  A plaintiff can prove knowledge through circumstantial evidence, such as evidence that a risk is "obvious." Id. (quoting Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015)).  However, a prison official is not deliberately indifferent when he knew about the medical condition "but believed (albeit unsoundly) that the risk . . . was insubstantial or nonexistent."  Farmer, 511 U.S. at 844.  Merely negligent treatment is not unconstitutional, as "many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."  Jackson, 775 F.3d at 178 (citing Estelle, 429 U.S. at 106).

The core of Campbell's motion for summary judgment concerns this prong of the deliberate indifference test.  See Def.'s Mem. (ECF No. 82, at 10–20).  Campbell explains that from his "perspective, . . . at the time that Mr. Lovelace became his patient, Mr. Lovelace was already being seen by a specialist at VCU who was monitoring his [HCV] and within whose purview any treatment decisions with regard to his [HCV] fell."  Id. at 11.  That being the case, Campbell argues that, as a matter of law, he cannot have acted with deliberate indifference because he was deferring to Bearman's recommendations as a treating specialist.  Id. at 15–16.  Campbell also argues that, at worst, his treatment was medically negligent, which is insufficient to violate the Eighth

Amendment. Id. at 19–20.  Here, there is a material dispute about whether Campbell subjectively acted with deliberate indifference.

> ### a.   A reasonable juror could conclude that Campbell could not defer to Bearman for HCV treatment.

Campbell insists that he "is entitled to the entry of judgment in his favor" because of Bearman's role as a specialist in Lovelace's treatment.  Def.'s Mem. (ECF No. 82, at 17).  Indeed, deliberate indifference is unlikely when the treating physician refers his patients to specialists.  See Henderson v. Kessler, 28 F.3d 1209, 1994 WL 276747, at *2 (4th Cir. 1994) (unpublished table opinion) (noting that the physician "saw [the inmate] frequently and referred him to specialists when necessary").  Campbell relies on a North Carolina case, Def.'s Mem. (ECF No. 82, at 18), in which the district court concluded that a physician's decision to "continu[e] the ongoing prescribed treatments [did] not 'shock the conscience'" of the court, in part because the physician "reasonably relied upon the prior medical decisions by a specialist . . . ."  Tovilla v. Woodard, No. 5:20-CT-03199-M, 2021 WL 3863351, at *7 (E.D.N.C. Aug. 30, 2021).  However, if the physician understands that a referral will not produce the necessary treatment, he might still be deliberately indifferent.  In Gordon v. Schilling, 937 F.3d 348 (4th Cir. 2019), the Fourth Circuit held that a medical director could still be negligent when he did "nothing more than get [the inmate] examined by a VDOC physician who . . . would be precluded from ordering HCV treatment" pursuant to the relevant guidelines.  Gordon, 937 F.3d at 358 (referencing guidelines on parole eligibility); see id. (accusing him of "repeatedly pass[ing] the buck").

In this case, Lovelace has produced significant evidence that Campbell did not rely on Bearman's treatment of Lovelace, or that his purported reliance was still deliberately indifferent in light of his own responsibility for Lovelace's care.  First, jurors could easily conclude that Bearman did not consider himself an HCV specialist.  He was an infectious disease specialist.

Bearman Dep. 7:13–16 (ECF No. 96-1). He testified that he was not a hepatologist, he did not work at the VCU Hepatology Clinic, he had never treated HCV in his career, and any HCV patients he had were referred to the VCU Hepatology Clinic. Id. 7:11–16, 10:24–11:6. Regarding his VDOC HIV patients that were coinfected with HCV, he testified that he would "defer" to the VDOC physicians. Id. 14:12–15:2. It was not clear that Bearman could even refer patients like Lovelace directly to the VCU Hepatology Clinic. See VDOC Guidelines (ECF No. 96-5, at 22, 35); see Pl.'s Opp'n (ECF No. 96, at 2); Def.'s Reply (ECF No. 97, at 3). Thus, there is substantial evidence in the record from which a jury could surmise that Bearman was not treating Lovelace's HCV.

Campbell argues that—even if he was wrong about Bearman's role—a jury still cannot find that he was deliberately indifferent because the test is subjective. See Def.'s Mem. (ECF No. 82, at 15). He argues there is no direct evidence to dispute his understanding of Bearman's role in Lovelace's HCV treatment. Id. at 17 n.11. In fact, Campbell repeatedly and unequivocally expressed throughout his deposition that he believed Bearman was the relevant HCV specialist. See generally Campbell Dep. (ECF No. 96-2). He characterized himself as only "a general practitioner," when Bearman was "an infectious disease specialist," and said he "took his guidance on the patient." Id. 22:8–23:13; see also id. 22:5–7, 49:10–17, 50:25. The record is clear that Campbell's litigation position will be that he relied on Bearman's guidance, despite Bearman's testimony that he was not providing treatment recommendations on HCV.

But as Lovelace identifies, there are many facts in the record from which a reasonable jury could infer that Campbell—subjectively—understood that Lovelace's HCV was beyond Bearman's treating purview. See Pl.'s Opp'n (ECF No. 96, at 16–17). First, Campbell acknowledged that he knew Bearman was not a hepatologist. Campbell Dep. 50:14–18 (ECF No.

96-2).  Campbell did not know of any other VDOC inmates seeing Bearman for their HCV.  Id.
50:25; see also id. 23:24–24:3.  Campbell was also familiar with the VDOC Guidelines, which
required all referrals for HCV treatment to be requested by the "facility" and approved by
Amonette.  This is a step Campbell acknowledged normally doing himself.  Id. 24:12–17.  The
VDOC Guidelines did not require physicians to defer to infectious disease doctors'
recommendations regarding HCV treatment.  Campbell Dep. 78:4–13 (ECF No. 96-2).  And
Campbell also acknowledged that Bearman never explicitly told him that he was treating
Lovelace's HCV.  Id. 49:10–17.

Most persuasively, in December 2015, Campbell calculated Lovelace's APRI and Fib-4
scores because he was HCV positive.  Id. 39:3–7.  Campbell understood that, under the VDOC
Guidelines, the resulting scores qualified Lovelace for a referral to the VCU Hepatology Clinic for
additional testing.  Id. 39:8–21, 40:16–21.  Bearman did not request that Campbell calculate the
scores, and Campbell did not share or discuss these results with Bearman.  When asked why he
did not immediately confer with Bearman regarding the need for a referral, Campbell testified that
he believed Bearman "had access to all the same labs" and "had the ability and capability of
calculating" the scores independently.  Id. 41:2–11.  But nowhere in Bearman's notes did Bearman
record Lovelace's APRI and Fib-4 scores, or indicate that he had independently calculated or
reviewed the scores.  Id. 70:5–11 (admitting that none of Bearman's notes refer to APRI or Fib-4
scores).  And Campbell testified he relied on those notes in "deferring" to Bearman's treatment
guidance.  In addition, in December 2016, Campbell took the "preemptive step" of ordering a
FibroScan and recalculating Lovelace's APRI and Fib-4 scores.  Id. 63:21–64:6.  However,
Campbell never discussed these scores and results with Bearman, or relayed them to him. Id. 84:8–
10.  Taken together, all of these facts are sufficient to allow a reasonable juror to conclude that

27

Campbell knew that Bearman was not treating Lovelace's HCV, and that testing Campbell ordered and interpreted demonstrated the need for such treatment.

> **b.      A reasonable juror could conclude that Campbell's actions amounted to more than medical negligence.**

Campbell also argues that "any alleged failure . . . would constitute, at worst, an inadvertent failure on his part." Def.'s Mem. (ECF No. 82, at 19). As noted above, medical negligence is not sufficient for a deliberate indifference claim. Jackson, 775 F.3d at 178 (citing Estelle, 429 U.S. at 106). Generally, any claim that "medical decisions . . . [are] not up to current medical standards states, at most, a claim of medical negligence or malpractice, not actionable under § 1983."[19] Parker v. Salmon, No. CIV.A. 705CV00699, 2005 WL 3088489, at *2 (W.D. Va. Nov. 17, 2005). While the evidence in the record could lead a reasonable juror to conclude that Campbell only committed medical negligence by failing to refer Lovelace to the VCU Hepatology Clinic, Lovelace has provided sufficient evidence to allow a reasonable juror to decide that Campbell's actions rose above medical negligence to the level of deliberate indifference.

Dr. Gaglio emphasizes that "[t]he current accepted standard of care for treating chronic HCV is to treat everyone, with very few exceptions." Gaglio Rpt. ¶ 3(b) (ECF No. 96-4). But the Fourth Circuit has recently explained that evidence of a violation of the standard of care "does not create an issue of material fact." Hixson v. Moran, 1 F.4th 297, 302 (4th Cir. 2021). In that case, the physician provided an "alternative treatment plan" with which the experts in the case disagreed, but which included "constant monitoring" that "show[ed] clearly [the physician's] concern for [the

---

[19] Lovelace has not alleged a medical malpractice claim in his complaint. See Compl. (ECF No. 1). The court in Parker v. Salmon No. CIV. A. 705CV00699, 2005 WL 3088489 (W.D. Va. Nov. 17, 2005), made the same observation, and then noted that "[t]o the extent that [plaintiff] is seeking to bring medical malpractice claims in this complaint, the court declines to exercise supplemental jurisdiction over such claims." Parker, 2005 WL 3088489, at *2 n.1 (motion to dismiss). This court similarly declines to decide such claims to the extent Lovelace is attempting to assert them.

inmate's] medical well-being." Id.  On that basis, the court concluded that the physician was not "so grossly incompetent as to permit a finding of deliberate indifference . . . ." Id.

Here, Campbell emphasizes his careful attention to Lovelace's medical records. See Def.'s Mem. (ECF No. 82, at 15-16). He met with Lovelace at least twice a year. See VDOC Rec. (ECF No. 87-1, at 61, 64, 72); (ECF No. 87-2, at 10); (ECF No. 88-3, at 46, 61, 67, 70).  He read Bearman's notes and ordered testing in accordance with them. See Campbell Dep. 22:8–23:13, 49:10–17 (ECF No. 96-2).  In Campbell's view, this reliance was justified "by the content of the medical records." Def.'s Reply (ECF No. 97, at 12 n.7).  In his reply, Campbell also claims that Lovelace's arguments "simply . . . suggest[] that [Campbell] is lying—an assertion not supported by any of the depositions or answers to interrogatories." Id. at 11.

However, the fact that Campbell was meeting with Lovelace and reviewing Bearman's notes does not mean that he failed to act with deliberate indifference.  See Pledger v. United States, No. 2:16-CV-83, 2018 WL 4627023, at *6 (N.D.W. Va. Sept. 27, 2018) ("[J]ust because prison officials give a prisoner some type of treatment does not mean the prison officials automatically avoid a Constitutional violation."), rev'd in part, vacated in part sub nom. Pledger v. Lynch, 5 F.4th 511 (4th Cir. 2021).  And while Campbell is correct that there is evidence in the record supporting his position that he was relying on Bearman's notes when making decisions regarding Lovelace's HCV treatment, that evidence is contradicted by other evidence in the record.  Lovelace has provided sufficient evidence to show a genuine dispute as to whether Campbell knew that Bearman was not treating Lovelace's HCV, and would not provide the referral necessary for such treatment.  Reasonable jurors could therefore conclude that Campbell's failure to refer Lovelace to the VCU Hepatology Clinic—particularly in light of the testing he repeatedly ordered and reviewed—rose above medical negligence to the level of deliberate indifference.

**B.    The Evidence Shows a Dispute of Material Fact About Whether Plaintiff Suffered a Significant Injury.**

Deliberate indifference is simply one element of a § 1983 claim.  Lovelace must also show that Campbell's conduct caused him a significant injury.  Coppage, 906 F. Supp. at 1035; Lester v. Clarke, No. 7:16-CV-00312, 2018 WL 6422495, at *4 (W.D. Va. Dec. 6, 2018) (citations omitted).  Lovelace's evidence shows that he was diagnosed with both HIV and HCV and developed liver cirrhosis before entering Campbell's care, see Pl.'s Ans. No. 8 (ECF No. 82-1, at 5), Lovelace Dep. 27:3–22 (ECF No. 96-3, at 28), Gaglio Rpt. ¶ 3(a) (ECF No. 96-4, at 2); that he ultimately received DAA treatment and was cured of his HCV after he left St. Bride's, Gaglio Rpt. ¶ 6 (ECF No. 96-4, at 5), see also Lovelace Dep. 25:21–26:2 (ECF No. 96-3, at 26–27); and that he currently has no physical symptoms from his liver cirrhosis, see Lovelace Dep. 64:20–67:19 (ECF No. 96-3, at 65–68) (reviewing medical report that he was asymptomatic); see also id. 100:12–101:5.  In light of these facts, to overcome summary judgment on the significant injury prong, Lovelace must show a material dispute about a significant injury stemming from the delay in treatment that occurred while Lovelace was in Campbell's primary care.[20]  See Def.'s Mem. (ECF No. 82, at 26).

Lovelace argues that he suffered a significant injury resulting from the delay—specifically, that he "developed the severest stage of cirrhosis of the liver" during his period of incarceration. Pl.'s Opp'n (ECF No. 96, at 18).  On the other hand, Campbell argues that Lovelace cannot establish that the delay in treatment Lovelace experienced "resulted in some substantial harm to

---

[20] There is substantial overlap between the objective prong of the deliberate indifference standard and the significant injury prong of a § 1983 claim.  See Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), 40 F.3d at 1187 ("The 'seriousness' of an inmate's medical needs also may be decided by reference to the effect of delay in treatment.").  For clarity, the delay is predominately discussed in relation to the § 1983 significant injury prong, although the caselaw frequently references the deliberate indifference objective prong.

him." Def.'s Mem. (ECF No. 82, at 26). Again, Lovelace has provided sufficient evidence in the record for a reasonable juror to conclude that the delay in receiving DAA treatment caused him a significant injury.

As the Fourth Circuit explained in Formica v. Aylor, 739 F. App'x 745 (4th Cir. 2018), "[w]here a deliberate indifference claim is predicated on a delay in medical care, we have ruled that there is no Eighth Amendment violation unless the delay results in some substantial harm to the patient, such as a marked exacerbation of the prisoner's medical condition or frequent complaints of severe pain." Formica, 739 F. App'x at 755 (cleaned up) (citations omitted); see also Tunstall-Bey v. Smith, No. 5:15-CT-3334-FL, 2019 WL 1442196, at *4 (E.D.N.C. Mar. 29, 2019). A "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1189 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2009). Serious injuries may result in "a life-long handicap or permanent loss." Coppage, 906 F. Supp. at 1037 (quoting Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987)).

Here, Lovelace already had HIV, HCV, and cirrhosis at the time Campbell became his primary care physician. See Pl.'s Ans. No. 8 (ECF No. 82-1, at 5); Lovelace Dep. 27:3–22 (ECF No. 96-3, at 28); Gaglio Rpt. ¶ 3(a) (ECF No. 96-4, at 2). However, Lovelace became eligible for additional liver testing in December 2015 based on his calculated APRI and Fib-4 scores. See Campbell Dep. 39:12–21 (ECF No. 96-2). By that time DAAs were well understood as effective even in HCV patients with an HIV coinfection. Gaglio Rpt. ¶ 3(c) (ECF No, 96-4, at 3). Lovelace was not referred for additional testing, and as a result received no treatment. See Campbell Dep. 39:22–40:2 (ECF No. 96-2); see also id. 40:7–15 (relying on Bearman's notations that there was

"no further treatment at this time"). Dr. Gaglio testified that untreated HCV—particularly with a HIV coinfection—places patients at an increased risk for serious health issues such as cancer, fibrosis, cirrhosis, and decompensated liver disease. Gaglio Rpt. ¶ 4 (ECF No. 96-4, at 4). In February 2017, Dr. Campbell ordered a FibroScan which showed that Lovelace had developed F4 cirrhosis, Bearman Dep. 103:13–21 (ECF No. 96-1), which is "enough inflammation to warrant treatment," id. 98:9–13. Again, Lovelace was not referred to the VCU Hepatology Clinic. Campbell Dep. 100:8–10 (ECF No. 96-2). Lovelace was treated, and eventually cured of his HCV infection after his release. But his expert points to objective evidence of liver damage, including an increased AFP level and liver nodules concerning for liver cancer in 2020 testing. These facts are sufficient for a reasonable juror to conclude that Campbell's failure to timely refer Lovelace for additional testing caused an "exacerbation of the prisoner's medical condition." Formica, 739 F. App'x at 755 (citations omitted).

Additionally, while Lovelace rests his damages primarily on his liver cirrhosis, see Lovelace Dep. 98:16-19 (ECF No. 96-3, at 99) (answering that his damages are "[c]irrhosis of the liver. I got to live with this."), he also testified that he "went through a lot" and "thought [he] was going to die in [prison.]" Id. 100:21–101:3. Lovelace alleges in his complaint that "[f]or five years, Mr. Lovelace pleaded with [VDOC] medical staff to administer" DAAs. Compl. ¶ 2 (ECF No. 1, at 2). A delay claim still has merit when it "unnecessarily prolong[s] an inmate's pain," Formica, 739 F. App'x at 755, and a reasonable juror could conclude that the delay in treatment Campbell caused here unnecessarily prolonged Lovelace's pain.

In arguing his position, Campbell relies on Tunstall-Bey v. Smith, No. 5:15-CT-3334-FL, 2019 WL 1442196 (E.D.N.C. Mar. 29, 2019), in which the court held that the plaintiff could not show a significant injury when he was cured of HCV and the treatment delay "did not cause any

significant harm to his liver." Tunstall-Bey, 2019 WL 1442196, at *4.  The court observed that

the plaintiff had "no admissible evidence showing that the delayed treatment itself (as opposed to

his pre-existing Hepatitis C) caused 'marked exacerbation' of his systems or substantial injury."

Id.  However, the facts of that case are distinguishable.  The Tunstall-Bey plaintiff only ever

showed "relatively mild damage" to his liver, id. at *2, as opposed to Lovelace's F4 cirrhosis,

Bearman Dep. 103:13–21 (ECF No. 96-1).  Furthermore, the Tunstall-Bey plaintiff was initially

ineligible for interferon therapy but was approved for DAA treatment as soon as his fibrosis score

increased.  Id.  Here, Lovelace's APRI and Fib-4 scores entitled him to further testing in December

2015, which he did not receive.  See Campbell Dep. 39:12–21 (ECF No. 96-2).  Likewise, Lovelace

still did not receive DAA treatment following the results of his February 2017 FibroScan, which

showed F4 cirrhosis—"enough inflammation to warrant treatment."  Bearman Dep. 98:9–13,

103:13–21 (ECF No. 96-1); see VDOC Rec. (ECF No. 88-3, at 9–14).  To the contrary, as Lovelace

explains, Campbell did not treat Lovelace's HCV "for ten months" after the FibroScan.  Pl.'s

Opp'n (ECF No. 96, at 18).  In light of these facts, Lovelace has shown a material dispute as to

whether the delay in receiving DAA treatment caused him a significant injury.

C.    **The Undisputed Evidence Does Not Establish Qualified Immunity.**

Campbell's last claim is that he should be "entitled to qualified immunity in this case."

Def.'s Mem. (ECF No. 82, at 27).  Qualified immunity is an affirmative defense that "protects all

government officials except those who violate a statutory or constitutional right that was clearly

established at the time of the challenged conduct."[21]  Jones v. Chandrasuwan, 820 F.3d 685, 691

---

[21] It is not clearly established that Campbell is eligible to assert the defense of qualified immunity.  Campbell is a private physician employed by VDOC.  See Def.'s Mem. SOF ¶ 3 (ECF No. 82, at 2).  "[P]rivate individuals may assert qualified immunity when they are retained by the government to assist in a task for which government employees performing such work are entitled to seek the protection of qualified immunity."  Hoskins v. Wexford Health Sources, Inc., No. CV DKC-17-3823, 2019 WL 1167815, at *10

(4th Cir. 2016) (quoting Carroll v. Carman, 574 U.S. 13, 16 (2014)) (cleaned up). Thus, qualified immunity applies unless (1) the plaintiff has shown the violation of a constitutional right; and (2) that right was "clearly established at the time of the defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232 (2009). Qualified immunity provides "immunity from suit" as well as a defense to liability. Id. at 231 (quoting Mitchell v. Forsyth, 472 U.S. 523 (1987)). The government official bears the burden of showing that he is entitled to qualified immunity. Meyers v. Baltimore Cty., Md., 713 F.3d 723, 731 (4th Cir. 2013). Here, Campbell has failed to show that he is entitled to qualified immunity because there are genuine disputes of material fact as to whether Lovelace's constitutional rights were violated and whether those constitutional rights were clearly established at the time Campbell was serving as Lovelace's primary care physician.

**1.** **There is a material dispute regarding an alleged violation of Lovelace's constitutional rights.**

Campbell argues—based on the Eighth Amendment analysis addressed in detail above—that Lovelace has not established that Campbell "violated Plaintiff's constitutional rights at all." Def.'s Mem. (ECF No. 82, at 28). However, as discussed in detail above, Lovelace has provided

---

(D. Md. Mar. 13, 2019) (quoting Filarsky v. Delia, 566 U.S. 377, 393–94 (2012)) (cleaned up). Lovelace does not challenge Campbell's eligibility to raise this defense. See Pl.'s Opp'n (ECF No. 96, at 19–22).

Campbell contends that other District Courts within the Fourth Circuit have extended qualified immunity to private physicians under Filarsky v. Delia, 566 U.S. 377 (2012). Def.'s Mem. (ECF No. 82, at 27-28). While one court found a private physician was entitled to bring a qualified immunity defense, this relied on a case in which no individual physicians were named as defendants. Wade v. Collins, No. 6:19-cv-3576 (Feb. 17, 2021) (ECF No. 154) (citing Redden v. Ballard, No. 2:17-cv-01549, 2018 WL 4327288 (S.D. W. Va. July 17, 2018), R. & R. adopted by No. 2:17-CV-01549, 2018 WL 4323921 (S.D. W. Va. Sept. 10, 2018), aff'd, 748 F. App'x 545 (4th Cir. 2019)). And as Campbell acknowledges, Def.'s Mem. (ECF No. 82, at 27), "[c]ircuits are divided on whether privately employed doctors who provide services at prisons or public hospitals pursuant to state contracts are entitled to assert qualified immunity," Hoskins, 2019 WL 1167815, at *10 (holding that physicians could assert qualified immunity as a defense). However, because there is a dispute of material fact as to whether Campbell was deliberately indifferent and the right is clearly established, a qualified immunity defense is inappropriate at this stage. See Pfaller v. Clarke, 630 B.R. 197, 200 (E.D. Va. 2021) (finding that at the summary judgment stage, defendant was not entitled to qualified immunity as to a claim of deliberate indifference to an inmate's HCV).

evidence sufficient to show a genuine dispute of material fact as to whether Campbell acted with deliberate indifference to Lovelace's medical needs and whether Lovelace suffered a significant injury as a result of the delay in treatment Campbell caused.  That being the case, Lovelace has shown a material dispute as to whether Campbell meets all of the elements for a § 1983 violation.

### 2. There is a material dispute regarding whether the constitutional right was clearly established at the time of Campbell's alleged misconduct.

In order to evaluate whether the constitutional right was "clearly established," a court must define the right at issue.  See Thompson v. Commonwealth of Virginia, 878 F.3d 89, 98 (4th Cir. 2017).  In denying Campbell, Amonette, and Herrick's previous motions to dismiss on qualified immunity grounds, this court addressed the right at issue in detail:

> [I]n the medical context, the proper level of particularity cannot limit the inquiry to whether there is a published controlling case addressing the precise medical condition and symptoms at issue, otherwise, prison officials would be free to decline any medical care until controlling precedent addressed the precise infirmity. Such proposition is best illustrated by the Fourth Circuit's recent decision in Scinto v. Stansberry, where the court rejected the defendant's invitation to define the right with specific reference to the doctor's decision to withhold a dose of insulin from a hostile diabetic inmate.  Noting that the right should not be defined with specific reference to the "very actions in question," the Fourth Circuit defined the right as "the right of prisoners to receive adequate medical care and to be free from officials' deliberate indifference to their known medical needs."

Order (ECF No. 23) (discussing Scinto, 841 F.3d 219 (4th Cir. 2016)) (cleaned up).

Notwithstanding this court's earlier decision on his motion to dismiss, Campbell argues that there was no constitutional right for an inmate to be treated with DAAs during the relevant time period of 2015-2018.  See Def.'s Mem. (ECF No. 82, at 29).  Campbell cites Cunningham v. Sessions, a district court case acknowledging "the rapidly evolving medical and legal issues" surrounding DAA treatment.   Cunningham v. Sessions, No. 9:16-CV-1292-RMG, 2017 WL 2377838, at *5 (D.S.C. May 31, 2017).  Based on these changing standards, the court therefore held that "[t]here is no clearly established statutory or constitutional right at this time for inmates

with chronic Hepatitis C to be treated with DAA drugs," and granted qualified immunity. Id. (granting motion to dismiss); see also Redden v. Ballard, No. 2:17-CV-01549, 2018 WL 4327288, at *8 (S.D.W. Va. July 17, 2018) (quoting and adopting holding in Cunningham, 2017 WL 2377838, at *5), R. & R. adopted by 2018 WL 4323921 (S.D.W. Va. Sept. 10, 2018), aff'd, 748 F. App'x 545 (4th Cir. 2019). In his opposition, Lovelace more broadly defines the right at issue relying on Gordon v. Shilling, which reiterates the "general constitutional rule that it is inconsistent with the Eighth Amendment for a prison official to withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's condition significantly deteriorates." Pl.'s Opp'n (ECF No. 96, at 20) (quoting Gordon, 937 F.3d at 359) (cleaned up).

I agree with Lovelace. While the cases Campbell cites are similar to the instant case, any attempt to define the right specifically with reference to DAAs is simply too narrow. As the Fourth Circuit has observed:

> Courts must take care to define the right at an appropriate level of specificity. Ordinarily, the unlawfulness of government conduct must be apparent in the light of pre-existing law. However, a general constitutional rule may apply with obvious clarity even though the very action in question has not previously been held unlawful. Thus, [government] officials can still be on notice that their conduct violates established law even in novel factual circumstances.

Thompson, 878 F.3d at 98 (cleaned up) (citations omitted) (emphasis added). Here, "even though the [failure to refer an inmate with chronic HCV for DAA treatment] has not previously been held unlawful," id., Gordon v. Schilling sets forth the general rule that "it is inconsistent with the Eighth Amendment for a prison official to withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's condition significantly deteriorates," Gordon, 937 F.3d at 359 (citations omitted). This rule, which was clearly established at the time Campbell served as Lovelace's primary care physician, see Jehovah v. Clarke, 798 F.3d 169, 181–82 (4th Cir. 2015), Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009), Fields v. Smith, 653 F.3d 550, 556 (7th Cir.

2011), is sufficiently clear to put Campbell on notice that failing to refer Lovelace for HCV treatment could constitute a violation of Lovelace's constitutional rights. The facts produced in Lovelace's opposition are sufficient for reasonable jurors to conclude that by 2016 DAAs were widely available, and their benefits well understood even in cases of HCV/HIV coinfection. Gaglia Rpt. ¶ 5 (ECF No. 96-4, at 4). Campbell has not cited any new case or fact to contradict this court's earlier ruling on his motion to dismiss that the right to necessary treatment for HCV was clearly established. See Pfaller, 630 B.R. at 215-16 (denying qualified immunity to VDOC medical director Amonette on challenge related to HCV treatment policy).

## V.     CONCLUSION

For the foregoing reasons, this court DENIES Defendant's motion for summary judgment (ECF No. 81).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

September 21, 2022